# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 24-1081V**

|  |  |
|---|---|
| RUSSELL YERGER,<br><br>                    Petitioner,<br><br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                    Respondent. | Chief Special Master Corcoran<br><br><br>Filed: February 18, 2026 |

*William E. Cochran, Jr., Black McLaren, et al., PC, Memphis, TN, for Petitioner.*

*Eleanor Hanson, U.S. Department of Justice, Washington, DC, for Respondent.*

### RULING ON ENTITLEMENT AND DECISION AWARDING DAMAGES[1]

On July 16, 2024, Russell Yerger filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that he suffered a right-sided shoulder injury related to vaccine administration ("SIRVA") as a result of an influenza ("flu") vaccine he received on September 25, 2023. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters.

Because the parties could not informally resolve the issue of entitlement and damages, they were ordered to file briefs setting forth their respective arguments and

---

[1] Because this Ruling/Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at  https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling/Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

were notified that I would resolve this dispute via an expedited "Motions Day" hearing, which ultimately took place on February 11, 2026. As discussed below, I find Petitioner entitled to compensation, and award him $115,000.00, for actual pain and suffering, plus $9,536.24 (undisputed) for unreimbursable medical expenses, for a total of $124,536.24.

## I.   Procedural History

On June 27, 2023, Respondent issued his Vaccine Rule 4(c) Report contesting entitlement in this case. ECF No. 29. On October 5, 2023, I issued a Scheduling Order setting forth my preliminary findings on the case, and encouraged the parties to consider settlement, but they were unsuccessful in their efforts. ECF No. 30. Thus, on April 8, 2024, Petitioner filed her Motion for Ruling on the Record and Brief in Support of Damages ("Mot."), and Respondent filed a Response on June 7, 2024 ("Opp."). Petitioner filed a reply ("Reply") memorandum on July 8, 2024. ECF Nos. 36-41.

## II.   Relevant Medical History

A complete recitation of the facts can be found in the medical records, the Petition, declarations and affidavits, the parties' respective pre-hearing filings, and in Respondent's Rule 4(c) Report.

In summary, Mr. Yerger was 62 years old when he received a flu vaccine[3] in his right deltoid on September 25, 2023, at a Walgreens Pharmacy located in Burlington, Washington. Ex. 2 at 1; Ex. 3 at 4. Mr. Yerger did not have a history of shoulder pain. Ex. 4 at 62-135. Mr. Yerger noted in his affidavit,

> I experienced a sharp pain at the time of injection. I noticed at the time of injection that the band aid applied was very high on my right shoulder. I noticed this because I received a Covid vaccine in my left arm at the same time. The band aid for the Covid vaccine was not placed as high on my shoulder. My shoulder was aching right away, and the pain continued to increase in intensity.

Ex. 1 at 1-2.

On December 18, 2023 (84 days after vaccination), Mr. Yerger contacted his primary care provider's ("PCP") office about his pain. Ex. 5 at 1. In his affidavit, however, he states that the first available appointment was not until February 6, 2024. Ex. 1, 5. The

---

[3] Mr. Yerger also received a COVID-19 vaccine in his left deltoid. Ex. 14 at 6.

records states, "[a]nnual exam, last 04/25/23 calendar year insurance, right shoulder pain." *Id*.

On February 6, 2024 (now four months and 12 days post-vaccination), Mr. Yerger went to his PCP, Dr. Aaron Brinklow, for complaints of "[a]nnual Exam (Pain in Rt arm since his flu shot 9/2023…" Ex. 4 at 52. Petitioner said that the pain was ongoing since his flu shot five months ago and was steadily increasing, and that "[w]hen receiving [the flu] shot [it] hurt right away." *Id*. at 53. Although his active range of motion ("ROM") was listed as normal, the record states that when reaching behind he experienced pain. *Id*. Petitioner's exam was "suggestive of impinged right shoulder possibly induced by inflammatory reaction following flu vaccine." *Id*. Dr. Brinklow advised him to adhere to a home exercise plan ("HEP") to improve ROM and strength and prevent adhesive capsulitis. *Id*. Petitioner was also referred for physical therapy ("PT"). *Id*. Mr. Yerger also received a Tdap vaccine "without complication" at this appointment. *Id*. at 52. The record does not indicate site of the relevant vaccination. *See id*.

Mr. Yerger initially treated his shoulder injury with conservative nonsurgical treatments. From February 29, 2024, to May 16, 2024, he attended eight acupuncture sessions for his right shoulder at Lynwood AcuCare Clinic. *See* Ex. 6 at 6-16; Ex. 13 at 4.

From March 5, 2024, to May 3, 2024, Mr. Yerger attended six PT sessions for his right shoulder at RET Physical Therapy & Healthcare Specialists. *See* Ex. 7 at 3-12; Ex. 8 at 1. At his initial session on March 5, 2025, Petitioner reported "that his shoulder started bothering him after flu shot on 09/25/24. P[atien]t states that his arm ached and notes that he might have got it the shot too high into the joint. P[atien]t notes that his arm really stung afterwards." *Id*.  A physical exam of the left shoulder demonstrated tenderness, abnormal range of motion, decreased strength and positive speeds, empty can and HK tests. *Id*. at 4.

On May 3, 2024, Mr. Yerger wrote to his PCP to report that he felt no progress had been made with his right shoulder despite PT, exercises at home, and acupuncture, and asked if he should get an MRI. Ex. 10 at 1. On June 1, 2024, his PCP referred him to an orthopedist and scheduled x-rays and an MRI. *Id*.

On July 5, 2024, Mr. Yerger underwent an MRI which revealed "1. High-grade partial-thickness bursal surface tear of the supraspinatus tendon at the insertion. 2. Infraspinatus tendinopathy. 3. Subdeltoid bursitis. 4. Mild DJD [degenerative joint disease] at the AC [acromioclavicular] joint." Ex. 11 at 1-2. Petitioner's right shoulder x-ray revealed moderated degenerative changes of the AC joint without degenerative changes of the glenohumeral joint and no high riding of the humeral head. Ex. 16 at 61.

3

On August 13, 2024, Mr. Yerger underwent an orthopedic consult with Christopher Sheu, M.D., for his right shoulder pain that had been progressing over the past year after receiving a flu shot on September 25, 2023. Ex. 19 at 2-6. Dr. Sheu's plan was to proceed with surgical arthroscopy of the right shoulder. *Id*.

On August 16, 2024, Mr. Yerger presented to orthopedist Matthew Oswin, D.O., for a second opinion and evaluation of his right shoulder. Ex. 15 at 59. Dr. Oswin noted "[i]njury as a result of flu vaccine. Patient now has crepitance and pain with forward elevation and abduction, difficulty with lifting. Sleep on the involved side interrupted after a couple of hours." *Id*. Dr. Oswin also noted that Mr. Yerger had lost ROM and had not been relieved by anti-inflammatory medications, PT, or acupuncture. *Id*. He diagnosed Petitioner with a full thickness tear of rotator cuff right shoulder with underlying adhesive capsulitis. *Id*. at 61. Dr. Oswin did not feel that further PT would improve Petitioner's condition, and recommended surgical intervention. *Id*.

On August 27, 2024, Mr. Yerger underwent a pre-operative exam in which he reported right shoulder pain that started after a flu shot in September 2023. Ex. 15 at 42. Physical exam of his right shoulder demonstrated decreased strength and limited ROM. *Id*. at 44.

Mr. Yerger underwent an arthroscopic repair of his right rotator cuff, a subacromial decompression, and lysis of adhesions on September 6, 2024. Ex. 15 at 38. His shoulder had significant adhesions, and a full-thickness supraspinatus tendon tear was noted. *Id*.

On September 17, 2024, Mr. Yerger underwent a post-operative examination. Ex. 15 at 16- 22. He was using a sling but healing well. *Id*. at 18. The plan was to start PT, continue sling until 6 weeks follow up, non-weight bearing until 10-12 weeks post-op, and no return to heavy labor until 6 months post-op. *Id*. On September 13, 2024, Mr. Yerger consulted his primary care physician for uvular necrosis that resulted as a complication of his shoulder surgery. Ex. 18 at 38-42; and Ex. 22.

On October 22, 2024, Mr. Yerger had a post-op follow-up with his orthopedist's office. Ex. 17 at 8. The record indicates that six weeks out from surgery, Petitioner was "[d]oing well, pain improved, and progressing well with physical therapy." *Id*. He thereafter started PT on October 30, 2024, and had a disability score of 52.27%. Ex. 21 at 10. From October 30, 2024, to January 16, 2025, Mr. Yerger completed 11 post-surgical PT sessions. Ex. 21 at 15-45. At the time, Mr. Yerger was working full-time as a sales representative. *Id*. at 8. After January 16, 2025, Mr. Yerger went on a trip to China and did not resume PT. *Id.* at 44.

Mr. Yerger had two follow-up appointments with his orthopedist's office for his right shoulder - on January 3, 2025, and March 11, 2025, respectively. Ex. 23 at 36, 48. By March 11, 2025, Petitioner reported experiencing "a little ache sometimes, but it's mostly been good." *Id*. at 36. During his March 11, 2025 exam, Petitioner's ROM had improved to beyond 170 degrees and abduction to 90 degrees. *Id*. He was released to work with the restriction of not lifting weights greater than 40 pounds and no repetitive overhead movements. *Id*.

Mr. Yerger states that despite all the above treatment and care, he still has not returned to baseline and still has tightness and soreness in his right shoulder, loss of range of motion, and weakness. Ex. 24 at 1.

### III.    Legal Standards

Before compensation can be awarded under the Vaccine Act, a petitioner must demonstrate, by a preponderance of evidence, all matters required under Section 11(c)(1), including the factual circumstances surrounding her claim. Section 13(a)(1)(A). In making this determination, the special master or court should consider the record as a whole. Section 13(a)(1). Petitioner's allegations must be supported by medical records or by medical opinion. *Id.*

To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Human Servs.,* 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). Contemporaneous medical records are presumed to be accurate. *See Cucuras v. Sec'y of Health & Human Servs*., 993 F.2d 1525, 1528 (Fed. Cir. 1993). To overcome the presumptive accuracy of medical records testimony, a petitioner may present testimony which is "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Human Servs.,* No. 11–685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (citing *Blutstein v. Sec'y of Health & Human Servs.,* No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)).

In addition to requirements concerning the vaccination received, the duration and severity of petitioner's injury, and the lack of other award or settlement,[4] a petitioner must establish that she suffered an injury meeting the Table criteria, in which case causation

---

[4] In summary, a petitioner must establish that she received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception; suffered the residual effects of her injury for more than six months, died from her injury, or underwent a surgical intervention during an inpatient hospitalization; and has not filed a civil suit or collected an award or settlement for her injury. *See* § 11(c)(1)(A)(B)(D)(E).

is presumed, or an injury shown to be caused-in-fact by the vaccination she received. Section 11(c)(1)(C).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine. 42 C.F.R. § 100.3(a)(XIV)(B). The criteria for establishing a SIRVA under the accompanying QAI are as follows:

Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

(i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

(ii) Pain occurs within the specified time frame;

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

### IV.     Ruling on Entitlement and Damages

After listening to the arguments of both sides, I issued an oral ruling on both entitlement and damages constituting my findings of fact and conclusions of law, pursuant to Section 12(d)(3)(A), at the conclusion of the February 11, 2026 hearing. An official recording of the proceeding was taken by a court reporter. I hereby fully adopt and incorporate that oral ruling as officially recorded.

### A.  Entitlement

Respondent has contested entitlement, arguing that there is not preponderant evidence that Mr. Yerger's right shoulder pain began within 48 hours of vaccination. Opp. at 6. He notes that Petitioner's first mention of right shoulder pain "occurs in an ambiguous record from December 18, 2023, that appears to be a telephone encounter… The record does not document a mechanism of injury or when petitioner's pain started and does not mention vaccination." Opp. at 6. Respondent also argues that because Petitioner did not seek care for his injury until more than four months post-vaccination, there is not "preponderant evidence [of] a finding that petitioner's shoulder injury began specifically within forty-eight hours of vaccination." *Id*.

A review of the record, however, does not provide corroboration for Respondent's objection. For example, the record of Petitioner's telephone call to his primary care provider on December 18, 2023, states: "[a]nnual exam last 04/25/23 calendar year insurance right shoulder pain." Ex. 5 at 1. Respondent's argument is that this notation is "ambiguous" and does not document a mechanism of injury. But this note needs to be taken in context with the larger record. Mr. Yerger confirms in his affidavit that he called his doctor's office on this date to complain about right shoulder pain and to schedule an appointment to be seen at the next available date. Ex. 1 at 1-2. The telephone record has very limited space to type notes, and it is not unreasonable to assume that the two notations of "right shoulder pain" was in reference to Mr. Yerger's complaint that the vaccine caused his injury, which is noted in the records of his visit on February 6, 2024. Ex. 4 at 52. The February 6, 2024 note itself states, "[p]ain in [righ]t arm since his flu shot 9/2023…" Id. The record further states "[r]ight arm pain; ongoing since his flu shot 5 months ago, steading increasing. Aching pain, shotting pain with moving on occasion, when receiving shot hurt right away..." *Id*. at 53. The information contained in this notation is all consistent with Mr. Yerger's affidavit.

In addition, there are other records supporting a 48-hour onset. On March 7, 2024, at his first chiropractic visit to treat his right shoulder, Mr. Yerger reported that he had "[p]ain in R upper arm" with an onset listed as "Sept 2023 after flu shot." Ex. 6 a 6. And the March 5, 2024 physical therapy appointment record states,

> Chief complaint: P[atien]t arrives with a history of R[ight] chronic shoulder pain. P[atien]t notes that his shoulder started bothering him after flu shot on 09/25/24. P[atien]t states that his arm ached and notes that he might have got the shot too high into the joint. P[atient] notes that his arm really stung afterwards. P[atien]t states that he went to see the doctor February 6th and did not do x-ray/MRI and referred to PT.

Ex. 7 at 3. I thus, find that Petitioner's right shoulder pain likely began within 48-hours of vaccination.

Even if a petitioner has satisfied the requirements of a Table injury or established causation-in-fact, he or she must also provide preponderant evidence of the additional requirements of Section 11(c), *i.e.*, receipt of a covered vaccine, residual effects of injury lasting six months, etc. *See generally* § 11(c)(1)(A)(B)(D)(E). But those elements are established or undisputed. Thus, based upon all of the above, Petitioner has established that he suffered a Table SIRVA, satisfying all other requirements for compensation.

## B. Damages

### a. Legal Standard

Compensation awarded pursuant to the Vaccine Act may include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). Petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no precise formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("Awards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award

for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.  *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

A special master may also look to prior pain and suffering awards to aid in the resolution of the appropriate amount of compensation for pain and suffering in each case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, a special master may rely on his or her own experience adjudicating similar claims. *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims). Importantly, however, it must also be stressed that pain and suffering is not determined based on a continuum. *See Graves v. Sec'y of Health & Human Servs.*, 109 Fed. Cl. 579 (2013).

### b.  Appropriate Compensation in this SIRVA Case

### i.  Awareness of Suffering

Neither party disputes that that Mr. Yerger had full awareness of his suffering, and I find that fact is supported by the record evidence.

### ii.  Severity and Duration of Pain and Suffering

As I noted during the Motions Day hearing, and as is incontestable from the record, Mr. Yerger's SIRVA did require surgical intervention. Thus, and in keeping with current Program treatment of SIRVA claims, a six-figure award for pain and suffering is likely appropriate, absent extraordinary circumstances.

Mr. Yerger's SIRVA injury overall appears to have been moderate to severe characterized by his pain levels and weakness, eight acupuncture sessions, six pre-surgery PT sessions, an MRI showing significant symptomology, arthroscopic surgery, 11 post-surgery PT sessions, and home exercises (no steroid injections). Mr. Yerger's surgical recovery was complicated by right acute otitis media and pharyngitis (Ex. 18 at 38-42). I note Petitioner's four-month gap before being treated in person, with his total treatment time amounting to approximately 18 months (September 2023 to March 2025).

Petitioner has cited four cases in support for his claimed amount for pain and suffering, *Meyers v. Sec'y of Health & Human Servs.*, No. 20-779, 2024 WL 706877 (Fed.

Cl. Spec. Mstr. Jan. 12, 2024), *Jones v. Sec'y of Health & Human Servs.*, No. 17-1890v, 2025 WL 585927, at *9 (Fed. Cl. Spec. Mstr. Jan. 14, 2024), *Roberson v. Sec'y of Health & Human Servs.*, 2020 WL 5512542 (Fed. Cl. Spec. Mstr. Aug. 7, 2020) and *Diaz v. Sec'y of Health & Human Servs.*, No. 20-1003, 2025 WL 948309 (Fed. Cl. Spec. Mstr. Feb. 24, 2025). I first note that *Roberson* was issued before the Motion's Day procedure was instituted approximately five years ago. Since then, hundreds of SIRVA decisions have been issued to hopefully assist the parties with their informal settlement discussions. These older SIRVA decisions thus reflect more of an *ad hoc* analysis that is not in line with the reasoning from more recent decisions. In addition, the *Jones* case was decided by Special Master Young outside of the SPU program. While decisions cited by other special masters are useful in helping to establish an appropriate amount for pain and suffering, the decisions made within SPU have been made to assist the parties with transparency and consistency in resolving cases. Thus, the SPU decisions tend to lend more persuasiveness to a claimed amount for damages.

The amount awarded in the *Meyers* case is a bit too high ($125,000.00 for pain and suffering), as that petitioner had a more severe injury as evidence by the amount of treatment she received. For example, the *Meyers* petitioner received four steroid injections, two MRIs, shoulder surgery, 21 PT appointments, and experienced daily pain for 16 months. Significantly, that claimant reported her pain very quickly after vaccination (just four days), which signifies the greater severity of her injury. *Meyers,* 2024 WL 706877 at *8.

The *Diaz* case, where a petitioner was awarded $115,000.00 in damages for past pain and suffering, is a better comparable case. Like Mr. Yerger, that petitioner delayed his initial treatment for more than three months. The *Diaz* petitioner was found to have suffered a moderate SIRVA, as his initial pain levels were at 5-8 and he had moderate ROM restrictions. However, when petitioner resumed care for his shoulder, his injury had worsened, and treatment consisted of surgery, a cortisone injection, 54 PT session, an ultrasound, one MRI, and medication. The *Diaz* petitioner's total length of treatment was 21 months, which includes a five-month treatment gap. *Diaz,* 2025 WL 948309, *4. If the treatment gap is subtracted, the *Diaz* petitioner had a treatment course of 16 months, which is similar to Mr. Yerger's treatment course. However, the *Diaz* petitioner had slightly more treatment, with a cortisone injection and 54 PT sessions, as compared to Mr. Yerger who had a total of 25 sessions (consisting of 8 acupuncture sessions and 17 total PT sessions). The *Diaz* petitioner underwent more than double the PT sessions. Although the *Diaz* petitioner had slightly more overall treatment, I do find this to be a very good comparable case.

By contrast, Respondent cites to six cases,[5] reflecting an awards range from $95,000.00 to $110,000.00. Respondent never proposed in briefing a precise counter-figure for pain and suffering, other than stating that an award "less than $125,000.00" (Opp. at 8).

Of the cases referenced by Respondent, I find that *Shields*, *Felland*, and *Crawford* are the best comparable cases. The *Shields* petitioner suffered a "moderately-severe" SIRVA overall, which was significant enough to require surgery, but mild enough for his care to cease almost immediately thereafter. The *Shields* petitioner had a similar delay in seeking care for over three months and he attempted to treat his injury conservatively before undergoing surgery. The MRI showed a high-grade rotator cuff tear, and petitioner underwent 18 sessions of PT, with two cortisone injections. The total treatment length was 15 months; however, this includes a five-month gap in treatment. In addition, the petitioner recovered very quickly after surgery, ceasing treatment just one month after. The Shields petitioner was awarded $95,000.00, in pain and suffering, which is a bit too low for Mr. Yerger given his longer treatment course.

The *Felland* petitioner was found to have suffered "a relatively mild SIRVA injury," with lower pain level and slightly limited ROM for approximately one year.  He sought treatment for his injury relatively quickly, 34 days after vaccination, and was administered two cortisone injections over the course of his treatment. He underwent shoulder surgery and 12 sessions of post-surgical PT. By his last sessions of PT, he reported no pain at rest, with activity, or when performing exercises. His overall treatment length was one year. While the *Felland* petitioner reported his pain fairly quickly, it is clear that his pain levels were in the mild to moderate range throughout his treatment, and he recovered speedily after surgery. This suggests that his injury was less severe than that of Mr. Yerger. The *Felland* petitioner was awarded $100,000.00 for pain and suffering.

Finally, the *Crawford* petitioner delayed seeking treatment for her injury for four months, like Mr. Yerger. She underwent significant treatment, including surgery, and endured a fairly long treatment course, consisting of three x-rays, three cortisone injections, 65 PT sessions, surgery, medication, a home exercise program, and activity modifications. Petitioner sought treatment for more than 20 months over a four-year

---

[5] *Shields v. Sec'y of Health & Human Servs.*, No. No. 20-1970V, slip op. (Fed. Cl. Spec. Mstr. Nov. 26, 2024) ($95,000.00), *Shelton v. Sec'y of Health & Human Servs.*, No. 19-0279V, 2021 WL 2550093) (97,500.00), *Langdon v. Sec'y of Health & Human Servs.*, No. 20-1311V, 2023 WL 3411103 (Fed. Cl. Spec. Mstr. May 12, 2023) ($99,000.00), *Felland v. Sec'y of Health & Human Servs.*, No. 20-406V, 2022 WL 10724100 (Fed. Cl. Spec. Mstr. Sept. 6, 2022) ($100,000.00), *Crawford v. Sec'y of Health & Human Servs.*, No. 19-0544V, 2024 WL 1045147 (Fed. Cl. Spec. Mstr. February 5, 2024) ($105,000.00), *Davidson v. Sec'y of Health & Human Servs.*, No. 20-1617V, 2024 WL 1152539 (Fed. Cl. Spec. Mstr. Feb. 8, 2024) ($110,000.00).

period. She was awarded $105,000.00 for her pain and suffering. Mr. Yerger's treatment length and overall treatment was lower, which prompts a lower pain and suffering award.

Using the *Diaz* case as a good barometer, I find that a good range for an award of pain and suffering for Mr. Yerger to be between $110,000.00 and $120,000.00. Based on all the circumstances and evidence submitted, I find that Petitioner's past pain and suffering warrants an award of $115,000.00.

### iii. **Unreimbursable expenses**

The parties have agreed that Petitioner has submitted preponderant evidence to support $$9,536.24, in past out-of-pocket expenses related to his shoulder injury, and I shall award that amount.

### Conclusion

Based on my consideration of the complete record as a whole and for the reasons discussed in my oral ruling, pursuant to Section 12(d)(3)(A), **I find that Petitioner is entitled to compensation and that $115,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering.[6]**

**Accordingly, I award Petitioner a lump sum payment of $124,536.24 (consisting of $115,00.00, for his actual pain and suffering plus $9,536.24, for unreimbursable medical expenses), to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a).

The Clerk of Court is directed to enter judgment in accordance with the Decision.[7]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[6] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[7] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.